In re the MARRIAGE OF DuWayne
P. HEUPEL, Petitioner,

and

Starr M. Heupel, Respondent.

No. 95SC754.

Supreme Court of Colorado,
En Banc.

April 21, 1997.

Otto, Miller & Davidson, John G. Otto, Colorado Springs, for Petitioner.

Gregory John Hock, P.C., Gregory John Hock, Colorado Springs, for Respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari in *In re Marriage of Heupel*, No. 94CA1291 (Colo.App. Oct. 19, 1995) (not selected for official publication), to determine the applicability of a property division clause in a marital separation agreement to a payment received by the former husband when he resigned from his position as a member of the armed services. Specifically, we consider whether DuWayne P. Heupel's lump sum payment, received from the United States Air Force under the Special Separation Benefit (SSB) program when he voluntarily elected to switch from active duty to reserve status, should be treated as retired pay for purposes of equitable distribution under the separation agreement of his dissolution decree.

A majority of a division of the court of appeals upheld the trial court's finding that the lump sum payment was marital property subject to equitable distribution but reversed the trial court's order of contempt against DuWayne Heupel. Three issues are presented for our review: (1) whether SSB pay-

ments are marital property; (2) whether a separation agreement can be reopened in light of the receipt of a "post-decree" benefit; and (3) whether state equitable distribution laws are pre-empted in the area of SSB payments which are disbursed pursuant to federal law.[1]

We now hold that state equitable distribution laws are not pre-empted by federal law with respect to SSB payments and that SSB payments are marital property subject to equitable distribution. We further hold that, because an SSB payment is marital property, it is not a "post-decree" benefit. Thus, we find that the trial court did not reopen the separation agreement. Instead, the trial court appropriately enforced the dissolution decree according to its terms concerning the division of retired pay. Accordingly, we affirm the court of appeals and remand to that court for disposition consistent with our decision.

## I.

The Heupels were married on February 19, 1973, and had one son, Jason DuWayne Heupel, on February 3, 1983. On December 5, 1989, DuWayne P. Heupel (Husband) and Starr M. Heupel (Wife) filed a petition for dissolution of their marriage. On March 13, 1990, the trial court entered a decree of dissolution incorporating the Heupels' separation agreement. Pursuant to the separation agreement, the Heupels agreed to the court's jurisdiction and stipulated to custody, child support, spousal maintenance, debts, and property division.

 Husband, an officer of the United States Air Force, had fifteen years of accredited service in the Air Force at the time of the dissolution. As to Husband's military retirement pension, which had not vested or

---

1. Our order granting certiorari set forth the following issues on review:

 1. Whether the court of appeals erroneously determined that a military special separation benefit disbursed pursuant to 10 U.S.C. § 1174a after the entry of a decree of dissolution constitutes marital property.

2. Whether the court of appeals erred in allowing the parties' agreement to be reopened wherein a post-decree benefit is created and transmuted into marital property.

3. Whether the court of appeals erroneously determined that state courts may apply state equitable distribution law to divide a military

matured at that time,[2] the separation agreement provided:

> Retirement Funds: Military Retirement—[Wife] will receive one-half of the 20 year value of [Husband's] military service retirement benefits upon his retirement.

In September 1993, Wife learned that Husband had transferred from active duty to reserve status.[3] At the time of his transfer, Husband had amassed seventeen years toward the twenty years of active duty service required for a military pension. *See supra* n. 2. Hence, Husband was only three years away from eligibility for military retired pay when he switched from active to reserve status. In conjunction with this "early-out," Husband received a $117,000 lump-sum settlement from the military, pursuant to the SSB program. *See* 10 U.S.C. § 1174a (1994). Wife then brought a motion seeking to enforce the provision of the separation agreement pertaining to Husband's military retired pay, quoted above, and seeking to hold Husband in contempt of the dissolution decree.

The trial court found that Husband "had voluntarily impaired [Wife's] rights under the separation agreement." Based on a contempt hearing, the trial court found that Husband's actions were in "wilful contempt" of the separation agreement and the court decree. Further, the trial court found that "the philosophical distinction between the normal military retirement pay entitlement and the separation benefit is nonexistent in a marital property discussion." The trial court

noted that the SSB benefit "is calculated in a fashion similar to retired pay based on years of service and grade," and "[t]o say that it is not a payment for recompense of past services seems ... to ignore the reality." Thus, the trial court concluded that the SSB payment was a "buy-out of retirement rights" and that there was no federal pre-emption of state distribution laws as applied to SSB payments.

The court of appeals reversed the trial court's contempt order because the SSB program was not in existence at the time the Heupels entered into the separation agreement and there were no appellate decisions from any Colorado court addressing distribution of such benefits. Therefore, the court of appeals concluded that Husband's failure to pay Wife half of the lump-sum benefit—under the separation agreement—did not constitute "wilful disobedience" of the dissolution decree. *Heupel*, No. 94CA1291, slip op. at 3.

Next, the court of appeals considered whether federal law pre-empted state equitable distribution provisions. In affirming the trial court, the court of appeals summarily invoked its decision in *In re Marriage of McElroy*, 905 P.2d 1016 (Colo.App.1995). In *McElroy*, the court of appeals, after analyzing the pertinent United States Supreme Court cases and federal statutes, concluded "that the trial court was not preempted by federal law from characterizing the SSB funds received by [the] husband as marital

---

special separation benefit disbursed pursuant to 10 U.S.C. § 1174a.

**2.** In general, a pension vests when its benefits are no longer subject to forfeiture. *See In re Marriage of Hunt*, 909 P.2d 525, 530 n. 2 (Colo. 1995); Brett R. Turner, *Equitable Distribution of Property* § 602 (2d ed.1994). A pension matures when an employee reaches a certain age and is eligible to receive benefits. *See Hunt*, 909 P.2d at 530 n. 2. By definition, a pension never matures before vesting. *See id.* Military pensions have certain "unique attributes" which we discussed in *Hunt*:

> A military pension is a defined benefit plan and is non-contributory in nature because only the employer contributes. In a military pension, an employee earns "credits" towards a pension based on, for example, years of active service. 10 U.S.C. § 1405 (1983). A military

pension vests after twenty years of creditable service. There is no partial vesting; a member of the military must attain twenty years of service or forfeit the entire pension. 3 William M. Troyan, et al., *Valuation & Distribution of Marital Property* § 46.32 (1995). Pension benefits are computed as a specific percentage of the active duty pay for the rank held at the date of retirement for each year of creditable service. 10 U.S.C. §§ 1406, 1407 (1983 & 1995 Supp.).

*Hunt*, 909 P.2d at 530.

**3.** Pursuant to 10 U.S.C. §§ 1174a(g), 1174(e)(1)(A) (1994), a separating service member must serve three years in the ready reserve of a reserve component after discharge from active service. Subsequently, a separating service member may seek re-enlistment in the ready reserve.

property and from awarding a portion of them to [the] wife." *McElroy*, 905 P.2d at 1020.

Last, the court of appeals rejected Husband's request to render an advisory opinion on what would happen if Husband becomes eligible to receive retired pay as a member of the ready reserve and "repays" the SSB payment when he turns sixty, an option under 10 U.S.C. §§ 1174a(g) and 1174(h) (1994). The court of appeals remanded the case back to the trial court "for further proceedings relative to other forms of relief requested in wife's motion." *Heupel*, No. 94CA1291, slip op. at 5.

Judge Roy filed a separate opinion concurring in part and dissenting in part. Following his dissent in *McElroy*, Judge Roy concluded that federal pre-emption precluded distribution of SSB payments.

## II.

The analysis of federal pre-emption is key to the resolution of the other issues before us. Federal pre-emption, of course, would be dispositive of the other issues. Under federal law, including the relevant United States Supreme Court decisions, pre-emption can be found only if SSB payments are not retired pay. If SSB payments are retired pay, then there is no pre-emption and SSB payments are marital property subject to equitable division. *See In re Marriage of Hunt*, 909 P.2d 525, 530 (Colo.1995) (holding that retired pay is divisible marital property). In addition, if it is marital property, an SSB payment cannot be deemed a post-decree benefit, and its division is not dependent on a reopening of the decree of dissolution. Hence, because our determination regarding federal pre-emption drives our resolution of the remaining two issues, we begin our discussion with federal pre-emption.

## A.

The United States Supreme Court has consistently held that, under the Supremacy Clause of the United States Consti-

tution, Article VI, Clause 2, a "state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 515, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981)); *see also* U.S.Const. art. VI, cl. 2 (stating that federal law "shall be the supreme law of the land" notwithstanding any state law or constitution to the contrary). As a starting point, federal pre-emption analysis mandates an inquiry into Congress's intent to pre-empt state law in a given area. *See Cipollone*, 505 U.S. at 515, 112 S.Ct. at 2616 (finding that congressional intent is the "ultimate touchstone" of federal pre-emption analysis). Congressional intent to pre-empt state law in a given area of law can be explicitly set forth or can be implicit. *See id.* "In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law ... or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (citations and internal quotation marks omitted).

The Supreme Court considered distribution of military retired pay in *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981). In *McCarty*, the Supreme Court addressed whether federal law prohibited a state court from dividing military nondisability pay upon dissolution of a marriage. The Supreme Court framed its inquiry as follows: "'whether the right as asserted [community property] conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program to require nonrecognition.'"[4] *Id.* at 221, 101 S.Ct. at 2735 (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583, 99 S.Ct. 802, 809, 59 L.Ed.2d 1 (1979)). After examining the relevant legislation and legislative history, the *McCarty* Court concluded that the asserted community property right and the express terms of the federal laws at issue were in conflict. The Court then explained that the communi-

---

4. Although *McCarty* involved a community property state, it is equally applicable to equitable distribution states. *See In re Marriage of Gallo*, 752 P.2d 47, 52 n. 5 (Colo.1988) (noting that the underlying analysis is the same in both equitable distribution and community property states).

ty property right injured the objectives of the federal program by, among other ways, diminishing retired pay, and held that state courts could not distribute military retired pay and thereby disrupt military personnel management. In reaching this conclusion, the Court noted that one of the underlying purposes of military retired pay is to ensure a youthful and vigorous military force. Thus, it reasoned that shielding retired pay protected key military interests.

Congress responded directly to the *McCarty* decision by enacting the Uniformed Services Former Spouses' Protection Act (USFSPA), 10 U.S.C. § 1408 (1994). The USFSPA provides that a state court can treat "disposable retired or retainer pay" as divisible upon dissolution of a marriage, but does not mandate distribution:

> Subject to the limitations of this section, a court may treat disposable retired [or retainer] pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court.

10 U.S.C. § 1408(c)(1) (1994).

Subsequent to Congress's enactment of the USFSPA, the Supreme Court considered, in *Mansell v. Mansell*, 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989), if state courts could treat retirement pay waived by the spouse—in order to receive veterans' disability benefits—as divisible marital property upon dissolution. In *Mansell*, the Supreme Court noted that "[b]ecause domestic relations are preeminently matters of state law," it has "consistently recognized that Congress, when it passes general legislation, rarely intends to displace state authority in this area." *Mansell*, 490 U.S. at 587, 109 S.Ct. at 2028. Thus, the Supreme Court explained that it has "held that [it] will not find pre-emption absent evidence that it is 'positively required by direct enactment.'" *Id.* (quoting *Hisquierdo*, 439 U.S. at 581, 99 S.Ct. at 808).

In resolving the issue before it in *Mansell*, the Court had to ascertain whether the USFSPA was a complete or only a partial rejection of *McCarty* and resolved that:

> Because pre-existing federal law, as construed by this Court, completely pre-empted the application of state community property law to military retirement pay, Congress could overcome the *McCarty* decision only by enacting an affirmative grant of authority giving the States the power to treat military retirement pay as community property.

*Mansell* at 588, 109 S.Ct. at 2028.

The Court concluded that the USFSPA gave state courts only limited authority to distribute retired pay because the USFSPA expressly excluded Veteran's Administration disability pay from the definition of "disposable retired pay." *See* 10 U.S.C. § 1408(a)(4)(B) (1994). Thus, the Court reasoned that the USFSPA was only a partial rejection of *McCarty* as it applied to *disposable* retired pay but not *total* retired pay and described the language of the USFSPA as "both precise and limited." *Mansell*, 490 U.S. at 588, 109 S.Ct. at 2028. We must now determine where SSB benefits fall within the framework established by *McCarty, Mansell*, and the USFSPA.

In the wake of the post-Cold War environment, a trend has emerged to reduce the size of the military services. Congress has characterized this as a "force drawdown environment." *See* H.R.Rep.No. 665, 101st Cong.2d Sess. 269 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2931, 2994. To realize this objective, Congress has instituted two statutory incentive programs in order to make early retirement an attractive option to military service members: the SSB and Voluntary Separation Incentive (VSI) programs. *See Elzie v. Aspin*, 841 F.Supp. 439, 440 (D.D.C. 1993) (explaining that the SSB and VSI programs were "designed to reduce the size of the armed forces in keeping with a perceived diminished threat to the United States' interests posed by the 'new world order'"). In exchange for retiring before their military pensions vest, separating service members receive benefits calculated on the basis of the service member's salary at the time of separation and the number of years in service. *See* 10 U.S.C. §§ 1174a(b)(2)(A), 1175(e)(1) (1994). Both the SSB and VSI programs will

be phased out in 1999. *See* 10 U.S.C. §§ 1174a(h), 1175(d)(3) (1994).

The SSB program, enacted by Congress in 1991, provides in relevant part as follows:

(a) Requirement for programs.—The Secretary concerned shall carry out a special separation benefits program under this section. An eligible member of the armed forces may request separation under the program. The request shall be subject to the approval of the Secretary.

(b) Benefits.—Upon the approval of the request of an eligible member, the member shall—

(1) be released from active duty or full-time National Guard duty or discharged, as the case may be; and

(2) be entitled to—

(A) separation pay equal to 15 percent of the product of (i) the member's years of active service, and (ii) 12 times the monthly basic pay to which the member is entitled at the time of his discharge or release from active duty....

10 U.S.C. § 1174a (1994).

Similarly, the VSI program, 10 U.S.C. § 1175, provides that:

(a) Consistent with this section and the availability of appropriations for this purpose, the Secretary of Defense and the Secretary of Transportation may provide a financial incentive to members of the armed forces described in subsection (b) for voluntary appointment, enlistment, or transfer to a reserve component, requested and approved under subsection (c), for the period of time the member serves in a reserve component.

10 U.S.C. § 1175(a) (1994).

A qualified candidate for voluntary separation can choose between the two programs which are distinguished only by the way in which the separation benefit is paid out. Specifically, under the SSB program, a qualified candidate receives a lump-sum payment, whereas, under the VSI program, a qualified candidate receives an annuity. *See* 10 U.S.C. §§ 1174a(b)(2)(A); 1175(e)(1) (1994). Failure to act upon an "early-out" retirement incentive may lead to involuntary separation, pur-suant to which an officer receives a lower separation benefit. *See* H.R.Conf.Rep.No. 102–311, 102nd Cong., 1st Sess. 556 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1042, 1112 ("The conferees believe this enhancement [over involuntary separation pay] will provide an equitable, up-front incentive for personnel to choose in lieu of facing the prospect of involuntary separation."); 10 U.S.C. § 1174(d) (1994) (requiring involuntary separation pay to be calculated by multiplying 10% of the product of the member's years of service and 12 times the monthly basic pay to which the member was eligible at the time of separation).

VSI and SSB benefits are not addressed in the USFSPA because these programs were not created until after the passage of the USFSPA. Thus, the specific question we are faced with here is whether SSB payments are accorded status as "disposable retired or retainer pay" under the USFSPA or whether such benefits are personal entitlements and fall within the ambit of general federal pre-emption described in *McCarty* and *Mansell*. *See Mansell*, 490 U.S. at 588, 109 S.Ct. at 2028 (holding that Congress must affirmatively grant authority to permit state courts to divide military retirement pay). Although Husband received an SSB payment rather than a VSI annuity, the SSB and VSI programs should be accorded the same status, for purposes of federal preemption analysis, because both programs serve the same purpose and are identical but for the means of allocating the separation benefit.

The Colorado Court of Appeals first considered this issue in *McElroy*, 905 P.2d 1016. In *McElroy*, the husband, an officer with the United States Air Force, accepted an SSB payment of $100,000 after 16 years of creditable service toward retirement. The husband and wife had reached a marital settlement agreement under which the wife was to receive 25% of the husband's military pension. As is the case here, the husband failed to inform the wife of the SSB payment. After reviewing *McCarty*, *Mansell*, the USFSPA, and the legislative history of the SSB and VSI programs, the court of appeals held, contrary to the trial court, that federal pre-emption did not preclude distribution of

the SSB payment. Subsequently, the court of appeals applied the same logic to VSI benefits. *See In re Marriage of Shevlin,* 903 P.2d 1227 (Colo.App.1995) (applying *McElroy* holding to VSI benefits).

Husband argues that the conclusion reached by the majority of the court of appeals in *McElroy* defies the USFSPA and the Supreme Court's holdings in *Mansell* and *McCarty.* We disagree. Husband's argument echoes Judge Roy's dissent in *McElroy.* In his dissent, Judge Roy concluded that "federal preemption with respect to military pay and benefits is broad and pervasive" but that the USFSPA is "narrow by its terms and should be so construed." *McElroy,* 905 P.2d at 1023 (Roy, J., dissenting). Judge Roy reviewed Congress's purposes for legislating the SSB and VSI programs and noted that "[t]he purposes announced by the Conference Committee for the adoption of voluntary separation pay clearly fall well within the federal interests relied upon by the Supreme Court [in *McCarty* ] for finding preemption in the first instance." *Id.* at 1024. Judge Roy also noted that, when it enacted the SSB and VSI programs, Congress did not amend the USFSPA to specify that state courts *could* treat benefits under those programs as divisible. *See id.*

■ Whether SSB and VSI payments can be divided by state courts in dissolution proceedings has been addressed recently by a number of jurisdictions. According to our research, the courts that have considered this issue to date have all but unanimously concluded that federal law does not bar state courts from dividing these benefits upon dissolution.[5] *See In re Marriage of Crawford,* 180 Ariz. 324, 884 P.2d 210 (Ariz.Ct.App. 1994); *Kelson v. Kelson,* 675 So.2d 1370 (Fla. 1996); *Blair v. Blair,* 271 Mont. 196, 894

P.2d 958 (1995); *Pavatt v. Pavatt,* 920 P.2d 1074 (Okl.Ct.App.1996); *Kulscar v. Kulscar,* 896 P.2d 1206 (Okl.Ct.App.1995); *Fisher v. Fisher,* 319 S.C. 500, 462 S.E.2d 303 (S.C.Ct. App.1995); *Marsh v. Wallace,* 924 S.W.2d 423 (Tex.Ct.App.1996); *see also Chotiner v. Chotiner,* 829 P.2d 829 (Alaska 1992) (holding that military severance pay that is part of a compensation package for discharge is analogous to retirement pay).[6]

One intermediate state appellate court has concluded otherwise. In *McClure v. McClure,* 98 Ohio App.3d 27, 647 N.E.2d 832 (1994), the Ohio appellate court held that, given the congressional intent underlying the VSI program, *i.e.,* concern about the effect of military strength reductions on service members and their families, "VSI payments are more closely analogous to severance benefits than retirement benefits." *McClure,* 647 N.E.2d at 841. That court concluded that VSI payments are separate, rather than marital, property.[7]

In a recent case that is particularly instructive, the Florida Supreme Court considered whether VSI payments are marital property subject to division. *See Kelson v. Kelson,* 675 So.2d 1370 (Fla.1996). In *Kelson,* the court was called upon to resolve an apparent conflict within the Florida Court of Appeals on divisibility of VSI benefits and, in doing so, weighed the arguments on both sides. *Compare Abernethy v. Fishkin,* 638 So. 2d 160 (Fla.Dist.Ct.App.1994) (holding that state distribution laws are not federally pre-empted as applied to VSI payments but then holding that even if federal pre-emption applied, there was no conflict under the separation agreement) *with Kelson v. Kelson,* 647 So.2d 959 (Fla.Dist.Ct.App.1994) (holding that VSI benefits are not divisible because they do not comprise retired/retainer pay), *rev'd,* 675 So.2d 1370 (Fla.1996) *and Baer v.*

---

5. Not all of these cases specifically address the federal pre-emption issue as such.

6. The military severance pay at issue in *Chotiner* was not received by the service member pursuant to the SSB or VSI programs.

7. We are also aware of a decision by the Wisconsin Court of Appeals reaching the same result as *McClure.* However, that decision was not selected for official publication and has no precedential value. *See In re Marriage of Anderson,*

197 Wis.2d 118, 541 N.W.2d 838 (table, text in Westlaw only), 1995 WL 551241 (Wis.Ct.App. Sept.19, 1995) (holding that VSI benefits are compensation for *not* continuing a military career rather than continuing it and, thus, are a buyout of future wages not property subject to division) (disposition not selected for official publication and, under Wisconsin rules, has no precedential value and can only be cited in limited circumstances).

*Baer,* 657 So.2d 899 (Fla.Ct.App.1995) (holding that VSI payments are not marital property because they are akin to severance pay not retired pay).

The Florida Supreme Court resolved the conflict among the district courts of appeal by finding VSI benefits to be the "functional equivalent of ... retired pay" and concluding that their division was not precluded by federal law. *Kelson,* 675 So.2d at 1372. Although the Florida Supreme Court noted that VSI and SSB payments are not covered under the provisions of the USFSPA, that did "not end [its] inquiry." 675 So.2d at 1372. Citing *Mansell v. Mansell,* 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989), the Florida Supreme Court explained that "domestic relations are preeminently matters of state law, [and] when Congress passes general legislation, it rarely intends to displace state authority in this area." 675 So.2d at 1373.

The Florida Supreme Court then reviewed the relevant legislative history and concluded that "a trial court may enforce a settlement agreement or dissolution decree providing for the division of military retired pay against VSI/SSB benefits." *Id.* With respect to the "force drawdown," the court noted that "the House Committee on Armed Services recommended 'a comprehensive package of transition benefits *to assist separating personnel and their families.*'" *Id.* (quoting H.R.Rep.No. 665, 101st Cong.2d Sess. 269 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2931, 2962) (emphasis added). The court inferred from this language that the separation pay was not solely for the separating service member but also for his or her family. The court also noted that a pamphlet, distributed by the Department of Defense, entitled "Voluntary Separation Incentive, VSI/SSB" provides as follows:

> "How will state courts treat VSI/SSB in a divorce settlement?
>
> The treatment of VSI or SSB is not dictated by Federal law. It will be up to the state courts to rule on the divisibility of these incentives."

*Kelson,* 675 So.2d at 1373 (quoting Department of Defense pamphlet).

We decline to follow Judge Roy's dissent in *McElroy* as well as those cases which reason analogously. Instead, we agree with the Florida Supreme Court's reasoning in *Kelson* and the prevailing view of those jurisdictions that have considered the issue presently before us. Thus, we hold that funds paid out under the SSB and VSI programs are accorded the same status as retired pay and that, consequently, state distribution laws are not pre-empted. In reaching this conclusion, we find persuasive that: (1) SSB and VSI benefits are calculated similarly to military pensions; (2) the military service member unilaterally elects to accept an "early out" under these incentive programs, and the purpose of the USFSPA would be defeated if division of SSB and VSI programs was foreclosed; and (3) Congress's intent in enacting the SSB and VSI programs is consistent with division of payments made pursuant to those programs in a dissolution setting. We explain more fully below the significance of these three considerations.

First, like a military pension, military service members who elect to take early retirement under either the SSB or VSI program receive a lump-sum payment or an annuity, respectively, based on the years of active service and the level of pay achieved at the time of separation. *See* 10 U.S.C. §§ 1174a(b)(2)(A) (providing that SSB lump-sum payment is "equal to 15 percent of the product of (i) the member's years of active service, and (ii) 12 times the monthly basic pay to which the member is entitled at the time of his discharge or release from active duty"); 1175(e)(1) (providing that VSI annuity is calculated by multiplying 2.5% of the service member's monthly base pay at the time of separation by 12 and by the member's number of years in the service); *see also Hunt,* 909 P.2d at 530 (describing how military pension benefits are computed). In this sense, SSB and VSI benefits are analogous to retired pay and are compensation for services already rendered. *See Fisher,* 462 S.E.2d at 305 ("Like retirement benefits, payments pursuant to an early separation are based in part on the length of time a person served in the military and his pay grade during his time of service."). In *Blair,*

the Montana Supreme Court aptly analogized SSB payments to a retirement "advance":

> Like retirement, [the husband's] eligibility for the SSB program was based on the number of years he served in active duty. As with retirement pay, [his] separation pay was calculated according to the number of years he was in active service. 10 U.S.C. § 1174a(b)(2)(A). [He] could have remained on active duty for five more years and received retirement pay. Instead he chose voluntary separation from the military and received his compensation at an earlier date. For the reasons we have stated, we characterize separation pay received under the Special Separation Benefits program (10 U.S.C. § 1174a) as an election for early retirement.

*Blair*, 894 P.2d at 961–62.

We acknowledge that their similar calculation to retired pay, *i.e.*, based in part on longevity and salary, is not dispositive of our characterization of SSB and VSI payments as retired pay.[8] However, SSB and VSI payments cannot be regarded as compensation for membership in the reserve or for other services to be possibly rendered some time in the future. *See Shevlin*, 903 P.2d at 1228 (holding that VSI payments are divisible and rejecting the husband's argument that a "VSI benefit is received for the performance of … admittedly nominal duties as a member of the inactive reserve"); *see also Marsh*, 924 S.W.2d at 424 (finding that the SSB payment "was in the nature of retirement pay, compensating [the husband] now for the retirement benefits [the husband] would have received in the future"). Nor can they be characterized as compensation for lost future income for the reasons addressed below. Therefore, the manner of their calculation persuades us that these payments are meant to compensate for the loss of the right to receive retired pay in the future whether

characterized as a buyout, an advance, or deferred compensation for services already rendered.

Second, to shield a service member's "early out" payment pursuant to the SSB or VSI programs from distribution would provide the service member with the unilateral ability to defeat his or her spouse's interest in military retired pay. *See Crawford*, 884 P.2d at 213 ("An employee spouse cannot defeat the nonemployee spouse's interest in retirement benefits by invoking a condition wholly within his or her control."); *Kelson*, 675 So.2d at 1372 (to hold that VSI benefits are not the functional equivalent of retired pay would permit a service-member spouse "to defeat the other spouse's court-awarded interest in military retirement benefits by unilaterally altering the form of those benefits in a manner that was unforeseeable at the time the award was made"). Furthermore, unilateral control to transform marital property into separate property could inappropriately sway a service member's decision to opt for the SSB or VSI program. This would have the undesirable consequence of divesting the nonemployee spouse of a valuable marital asset.[9]

Such unilateral control undermines Congress's intent in legislating the USFSPA and the SSB/VSI programs. Congress enacted the USFSPA specifically to counteract the effect of the Supreme Court's decision in *McCarty* and, thereby, granted state courts the option to divide military pensions upon dissolution. The unilateral control to negate the future right to receive distributable retired pay—by receiving it as present-day separate property—would seriously undercut the primary purpose of the USFSPA. Furthermore, legislative history supports our conclusion that SSB and VSI benefits are not personal entitlements meant to remain the

---

**8.** For example, although their calculation is based on current salary and longevity, the court of appeals characterized workers' compensation benefits as not being marital property to the extent that such benefits were meant to compensate for lost and/or diminished future earnings. *See In re Marriage of Smith*, 817 P.2d 641 (Colo. App.1991); *see also In re Marriage of Holmes*, 841 P.2d 388, 390 (Colo.App.1992) (holding that a severance plan providing an incentive for employees to remain in employment for a certain amount of time was not marital property despite the fact that "the amount of benefits to be received [was] based on length of employment or current salary").

**9.** As we noted in *Hunt*, a pension is frequently the most valuable property right in the marital estate. *Hunt*, 909 P.2d at 538.

personal property of the separating service member in the dissolution context.[10] Specifically, Congress enacted the programs "to assist separating personnel and their families in readjusting to civilian life" during a time of strength reduction.[11] H.R.Rep.No. 665, 101st Cong.2d Sess. 269 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2931, 2962. In *Crawford,* the Arizona Court of Appeals considered this quoted language and noted that it suggested "that equitable division of SSB benefits is not inconsistent with congressional intent." *Crawford,* 884 P.2d at 212. *See also Kelson,* 675 So.2d at 1373 (noting Congress's concern for the families of separating military personnel); *Marsh,* 924 S.W.2d at 426 (quoting the same language and concluding that SSB payments differ from involuntary separation because in the voluntary process "the member voluntarily forfeits the opportunity to earn and receive future retirement benefits that otherwise would become due upon successful completion of the required service").

Similarly, the House Armed Services Committee stated in 1991 when considering the SSB and VSI programs that:

The conferees take this action because of their concern over the effect of strength reductions during the next few years on our men and women in uniform and their families. The conferees especially recognize that this drawdown in strength is different from previous drawdowns because it affects the people who are a product of an all volunteer force. Therefore,

the conferees would provide these temporary authorities as tools to assist the military Services in selectively reducing, on a voluntary basis, that portion of the career personnel inventory that is not retirement eligible. The conferees believe that these authorities would give a reasonable, fair choice to personnel who would otherwise have no option but to face selection for involuntary separation, and to risk being separated at a point not of their own choosing.

H.R.Conf.Rep.No. 102–311, 102nd Cong. 1st Sess. 556 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1042, 1112.

Therefore, we disagree with Judge Roy's characterization of Congress's intent in *McElroy,* 905 P.2d 1016, and, likewise, the reasoning of the Ohio Court of Appeals in *McClure,* 98 Ohio App.3d 27, 647 N.E.2d 832, *i.e.,* that SSB and VSI benefits comprise severance pay.

Our conclusion, that division of SSB and VSI payments in the dissolution context comports with congressional intent in enacting the USFSPA and the SSB/VSI programs, is supported by the Department of Defense pamphlet cited by the Florida Supreme Court in *Kelson.* *See supra* p. 568 (quoting pamphlet). In that pamphlet, the Department of Defense states that treatment of such benefits is not governed by federal law

---

10. We are aware of legislation proposed by then-Representative Patricia Schroeder, H.R. 3574, introduced on November 19, 1993, which would have specified that SSB and VSI benefits are retired pay and subject to state court division. That legislation was submitted to the House Committee on Armed Services but no action was taken by that committee. Nothing can be inferred from that inaction. *See, e.g., Tahoe Reg'l Planning Agency v. McKay,* 769 F.2d 534, 538 (9th Cir.1985) (explaining that while "unsuccessful attempts to amend proposed legislation during the process of enactment" is relevant in interpreting the adopted measure, the same does not hold true for "unsuccessful attempts to amend a measure passed by a previous legislative session"). Indeed, we could draw completely opposite conclusions from the committee's failure to act upon the proposed legislation. For example, it could indicate that the committee believed the legislation was not necessary because SSB and VSI benefits were already includ-

ed in retired pay and, thus, covered by the USFS-PA. Alternatively, some committee members may have disagreed with the substance of the legislation.

11. Husband argues that this statement of congressional intent should inure to the benefit of his present family (Husband has remarried) rather than to his former spouse. We note that marriage is an economic partnership. As we recognized in *Hunt,* deferred compensation, such as retired pay, by its nature requires that former spouses extend their economic partnership beyond the date of dissolution. *See Hunt,* 909 P.2d at 537 (explaining that "if the parties each have a continuing interest in the pension that extends beyond the marriage, the 'economic partnership' forged during the marriage in effect survives the marriage"). Thus, Wife is included in Congress's concern for family members impacted by the force drawdown environment.

and that state courts will determine their divisibility in a dissolution setting.

Our conclusion is bolstered further by 10 U.S.C. § 1174(h), pursuant to which certain payments, including SSB and VSI payments, are recouped from the retired pay that a separating member may become eligible to receive in the future. That section provides as follows:

> (h) Coordination with retired or retainer pay and disability compensation.—(1) A member who has received separation pay under this section, or separation pay ... under any other provision of law, based on service in the armed forces, and who later qualifies for retired or retainer pay ... shall have deducted from each payment of such retired or retainer pay so much of such pay as is based on the service for which he received separation pay ... until the total amount deducted is equal to the total amount of separation pay ... received.

10 U.S.C. § 1174(h) (1994).

That the separating officer must "repay" the benefits received under the SSB and VSI programs in order to receive retired pay (if he or she later becomes eligible to receive it), is strong evidence that SSB and VSI payments are a form of retired pay in the first instance. Specifically, if these benefits were intended to compensate for lost future income, they would not be subject to recoupment from retired pay. As stated by the Texas Court of Appeals:

> The recipient who reenlists and later becomes eligible for retirement has in effect received a prepayment on retirement pay because the retirement benefits are reduced by the amount of the SSB payment. Thus, one can wait to receive regular retirement benefits or opt out in favor of an SSB payment, but not both.

*Marsh*, 924 S.W.2d at 426.

Thus, the payments received pursuant to the SSB and VSI programs cannot be likened to severance pay or, more specifically, compensation for lost future *income*. This makes practical sense. Because the benefits are received at the election of the separating member, the member accepts the risks associated with the transition into civilian life and may have already planned ahead for those risks by securing post-discharge employment in advance.[12]

■ We conclude that the spouse should share in the SSB and VSI payments at the time they are received and, if the separating member becomes eligible for retired pay at a later date, the spouse should also share in that retired pay. In sharing in the retired pay, the spouse necessarily shares in the loss of retired pay that is recouped by the military.

We note that a separating service member's retired pay, subsequent to receipt of SSB or VSI benefits, typically results in a lowered total benefit. As a member of the reserve, the separating member is not eligi-

---

**12.** Thus, we do not agree that the reasoning expressed in *In re Marriage of Kuzmiak*, 176 Cal.App.3d 1152, 222 Cal.Rptr. 644 (1986), would apply to SSB and VSI benefits. In *Kuzmiak*, a case cited by Judge Roy in his *McElroy* dissent, *involuntary* separation pay, pursuant to 10 U.S.C. § 1174, was characterized as financial assistance to the separating officer during a transition period into civilian life and compensation for lost future wages rather than compensation for past services. *See Kuzmiak*, 222 Cal.Rptr. at 646. In *Kuzmiak*, the husband had been passed over for promotion twice and this required his discharge. The *Kuzmiak* analysis is inapplicable here because it addressed involuntary separation pay rather than SSB and VSI payments, which are received at the election of the separating service member. *See Crawford*, 884 P.2d at 213 (stating that the pay at issue in *Kuzmiak*, "unlike other benefits based on longevity of service, does not serve to compensate for past services").

Moreover, although we did not find any California decisions addressing SSB and VSI payments, we note that *Kuzmiak* would not compel a holding that such benefits are not community property. *See In re Marriage of Gram*, 25 Cal. App.4th 859, 30 Cal.Rptr.2d 792 (1994). In *Gram*, the court considered whether benefits under a voluntary retirement plan, offered by a newspaper to its employees, were community property and concluded that the early retirement plan was "a part of, and intended to be, the realization of [the husband's] retirement expectation and thus a form of deferred compensation for services rendered." *Id.* 30 Cal.Rptr.2d at 796. Thus, it was not a "present payment for loss of earnings." *Id.* Given the result in *Gram*, California courts may determine that SSB and VSI payments are retired pay.

ble to receive retired pay until he or she turns sixty. *See Kulscar,* 896 P.2d at 1208 ("Although [a member's] reenlistment in the reserve may allow him to use his previous active duty service to qualify for retirement benefits, the total benefits will be substantially less than if he had retired from active duty [because the retirement benefits will not be received until the member reaches age sixty]."). In contrast, a member who retires from active duty is eligible to receive retired pay after twenty years of creditable service. The twenty years are usually up, and the member is eligible to receive retired pay, before reaching the age of sixty, thereby resulting in a higher total benefit because the member may receive benefits for a longer period of time.

Thus, to prevent the spouse from sharing in the SSB or VSI benefits works a double injustice. First, because the decision to reenlist in the ready reserve rests entirely in the control of the separating service member, the spouse must wait for a prolonged period to receive an uncertain benefit without sharing in the present benefit. Second, that uncertain retirement benefit will be lower than the benefit the service member would have been eligible to receive if he or she stayed in active duty for a full twenty years.

As a member of the ready reserve, Husband continues to accumulate credits toward a retirement pension pursuant to which he will be eligible to receive benefits when he turns sixty. If Husband later qualifies to receive retired pay, Wife would be eligible to receive 50% of the retired pay as stipulated by the parties in the separation agreement. Her receipt of 50% of the SSB payment does not preclude her from sharing further in future retired pay. Both parties would necessarily share equally in the loss of retired pay attributable to the military's recoupment of the SSB payment pursuant to 10 U.S.C. § 1174(h) (1994).

We agree with both courts below that state courts are not precluded by federal law from distributing SSB lump-sum payments.

### B.

■ We consider next whether SSB and VSI payments are marital property subject to distribution and if the trial court erred in reopening the decree. The disposition of the first issue on certiorari review renders it axiomatic that such funds are marital property. We have held that military pensions are marital property. *See Hunt,* 909 P.2d 525; *In re Marriage of Gallo,* 752 P.2d 47, 54 (Colo.1988); *In re Marriage of Grubb,* 745 P.2d 661, 665 (Colo.1987). Correspondingly, SSB and VSI funds are marital property because, as with pensions, the benefits accrued are directly attributable to the years of service during the marriage. Because this is true, we reject Husband's contention that his SSB payment was a post-decree asset which should be categorized as his separate property and that the trial court improperly reopened the dissolution decree.

■ Post-decree assets are not considered marital property and, thus, are not distributable. *See* § 14–10–113(2)(c), 6B C.R.S. (1987) (providing that "property acquired by a spouse after a decree of legal separation" is excepted from the definition of marital property and, thus, immunized from division); *In re Marriage of Faulkner,* 652 P.2d 572, 574 (Colo.1982) (holding that the court cannot distribute property acquired after dissolution). While the $117,000 was paid out to Husband after the decree was entered, it is not a post-decree benefit as that phrase is understood in this context. As with traditional military pensions, its delayed distribution does not affect the marital attributes of the SSB benefit. The SSB payment of $117,000 is marital property regardless of when and how it was distributed. *See* § 14–10–113(2), 6B C.R.S. (1987) (providing that marital property is "all property acquired by either spouse subsequent to the marriage").

Hence, the trial court did not reopen the decree. Rather, the trial court appropriately enforced the decree which incorporated the parties' separation agreement. This is implicit in the court of appeals' holding that the "early out" SSB payment received by Husband is the functional equivalent of retired pay. The Florida Supreme Court, faced with a similar situation in *Kelson,* 675 So.2d 1370, ruled that the trial court did not have to modify the parties' settlement agreement be-

cause the VSI payments were a form of retired pay. Since the parties in *Kelson* had agreed to divide the husband's retired pay pursuant to a settlement agreement, the trial court merely had to enforce the Kelsons' settlement agreement and apportion to the wife the same percentage of the husband's VSI payments that she would have shared in if he had received regular retired pay. *See also Fisher,* 462 S.E.2d at 305 (rejecting the husband's argument that the court lacked subject matter jurisdiction to modify the original property division when the husband elected to receive VSI benefits in lieu of retired pay because the retired pay provisions of the parties' separation agreement applied). Therefore, the trial court did not erroneously reopen the separation decree.

In prior cases, we have explained the trial court's duty to make an equitable distribution of a pension benefit and adopted the "time rule" formula if distribution is delayed under either the deferred distribution or reserve jurisdiction methods. *See In re Marriage of Kelm,* 912 P.2d 545, 550 (Colo.1996); *Hunt,* 909 P.2d at 535–36. However, because the parties stipulated to the division of Husband's military pension, we need not discuss the means of distribution of the SSB payment. Wife is to receive 50% of the SSB payment as agreed upon by the parties in their separation agreement.

### III.

For the foregoing reasons, the judgment of the court of appeals is affirmed. The case is remanded for further proceedings consistent with our decision.